# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

ELECTRONIC PRIVACY INFORMATION
CENTER, et al.,

                Plaintiffs,

    v.

U.S. OFFICE OF PERSONNEL
MANAGEMENT, et al.,

                Defendants.

Civil No. 1:25-cv-255-RDA-WBP


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Defendants U.S. Office of Personnel Management ("OPM"); Charles Ezell, in his official capacity as Acting Director of OPM; OPM DOGE Team; U.S. Department of the Treasury ("Treasury"); Scott Bessent, in his official capacity as Secretary of the Treasury; Treasury DOGE Team; U.S. Digital Service, also known as the U.S. DOGE Service ("USDS"); U.S. DOGE Service Temporary Organization ("USDSTO"); Amy Gleason, in her official capacity as Acting Administrator of USDS and USDSTO; Elon Musk, in his official capacity as Senior Advisor to the President in the Executive Office of the President; Steve Davis, in his official capacity as Senior Advisor to the USDS; General Services Administration ("GSA"); and Stephen Ehikian, in his official capacity as Acting Administrator of GSA, submit this Memorandum in Support of their Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 51).

## INTRODUCTION

The Amended Complaint's headline is that this case concerns "the largest and most consequential data breach in U.S. history." Am. Compl. ¶ 1. But Plaintiffs' factual allegations fail to live up to that billing, even with the benefit of an amended complaint. Instead, Plaintiffs allege—at most—that federal agencies have granted access to federal data systems to federal employees expressly tasked with improving the federal government's IT infrastructure. As even Plaintiffs concede, federal employees have *always* had access to these data systems; what Plaintiffs complain about here is *which* federal employees are now accessing those systems. In Plaintiffs' view, only "career civil servants" should be allowed into the systems, rather than the employees that the new Administration has selected for the task. *Id.* ¶ 68. But this personnel preference is not the stuff of a federal action. The intangible injuries Plaintiffs assert—"unease," "offense," and "fear," *id.* ¶¶ 125-26—do not meet even the threshold standing requirements of Article III, much less state a claim for relief. Nor may Plaintiffs rely on speculation as to future harms that may, or may not, occur if the information within the data systems were somehow compromised.

At bottom, this case presents a policy dispute unfit for resolution by the Judiciary. Granting employees access to agency data systems is a routine governmental decision made daily across any number of government agencies, and Plaintiffs' speculation about hypothetical consequences cannot serve as the basis for a federal action. Indeed, well established law forecloses Plaintiffs' attempt to have this Court oversee the day-to-day information-technology operations of Treasury and OPM. The Court should grant Defendants' motion and dismiss this action.

## BACKGROUND

### I.       The United States Department of Government Efficiency Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established U.S. Digital Service to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8,441, § 4 ("USDS EO"). The USDS EO redesignated the U.S. Digital Service as the Department of Government Efficiency Service, or U.S. DOGE Service. *Id.* § 3(a). It established a "U.S. DOGE Service Temporary Organization" in the Executive Office of the President under 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS EO § 3(b). The USDS EO requires agency heads to establish in their respective agencies a USDS team of at least four employees. *Id.* § 3(c).

The USDS EO directs USDS to collaborate with Executive agencies to "modernize" the technology and software infrastructure of the federal government to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems" as well as "ensure data integrity." USDS EO § 4. To accomplish its objectives, the USDS EO directs USDS to work with relevant agency heads, and vice versa, to ensure USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with

law." *Id.* § 4(b). At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards." *Id.*

Executive Order 14,170, also issued on January 20, 2025, tasks the Director of OPM, among others, with developing a Federal Hiring Plan that, among other things, "integrate[s] modern technology to support the recruitment and selection process, including the use of data analytics to identify trends, gaps, and opportunities in hiring." 90 Fed. Reg. 8,621, § 2(b)(vi).

## II. Plaintiffs' Amended Complaint

### A. Plaintiffs allege that OPM and Treasury have granted access to their systems to "DOGE" or "DOGE Affiliates."

Plaintiffs are the Electronic Privacy Information Center ("EPIC"), a nonprofit organization, and Doe 1, a current federal agency employee. Am. Compl. (ECF No. 51) ¶¶ 11-12. Plaintiffs filed their original complaint on February 10, 2025, *see* Compl. (ECF No. 1), and their Amended Complaint on May 6.

The Amended Complaint alleges that "employees at USDSTO, GSA, and OPM" and "individuals . . . directly employed by host agencies" are a "network of personnel tasked with carrying out the President's DOGE Agenda" that "can collectively be referred to as 'DOGE' or 'DOGE Affiliates.'" *Id.* ¶¶ 53-54. The Amended Complaint alleges that simply by granting access to this "network of personnel," as directed by the USDS EO, Treasury and OPM have "disclosed vast stores of PII [personally identifiable information]" in the agencies' Bureau of the Fiscal Service ("BFS") and Enterprise Human Resources Integration ("EHRI") systems, respectively. *Id.* ¶¶ 40, 62, 64, 83, 97, 107, 116. According to the Amended Complaint, by granting that access to their systems, Treasury and OPM have "unlawfully disclos[ed] extremely personal information about Plaintiffs . . . to unchecked actors in violation of law." *Id.* ¶ 117. Neither EPIC, on behalf of any individual member, nor Doe alleges anywhere in the Amended Complaint that this alleged

access was to *their* information as opposed to the BFS and EHRI systems generally or that any information at all was disclosed to non-government recipients. *See generally id.*

B.      **Plaintiffs' claims and requests for relief**

The Amended Complaint asserts eight causes of action. In Count I, Plaintiffs allege that Treasury and OPM have violated the Privacy Act of 1974 by "disclos[ing]" Plaintiffs' personal data in violation of 5 U.S.C. § 552a(b) and by "us[ing] such data for computer matching" in violation of § 552a(o). Am. Compl. ¶¶ 127-31. In Count II, Plaintiff Doe 1, only, alleges that Treasury and Secretary Bessent have "disclos[ed] and inspect[ed]" her tax return information in violation of the Internal Revenue Code, 26 U.S.C. § 6103. Am. Compl. ¶¶ 132-37. In Count III, Plaintiffs claim that Defendants, "by providing access to confidential PII," have deprived EPIC's members and Doe 1 of their liberty interest in "avoiding disclosure of personal matters" under the Fifth Amendment's Due Process Clause. *Id.* ¶¶ 138-41. In Count IV, Plaintiffs assert that Treasury and OPM's "system access policies" "violate a number of legal requirements, including" the Privacy Act; the Federal Information Security Modernization Act of 2014 ("FISMA"), 44 U.S.C. §§ 3554(a)(1)-(2); 26 U.S.C. § 6103; and the Fifth Amendment and thus under the Administrative Procedure Act ("APA") are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); and were established without observance of procedure required by law, *id.* § 706(2)(D). Am. Compl. ¶¶ 142-47. In Count V, Plaintiffs assert that Treasury and OPM system access policies "were hasty, ill-considered, unsupported, and destructive to the interests that government privacy laws are intended to advance" and thus were arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). Am. Compl. ¶¶ 148-53. In Count VI, Plaintiffs claim that Treasury and OPM did not comply with the APA's notice-and-comment rulemaking procedures in violation of 5 U.S.C. § 553. Am. Compl. ¶¶ 154-59. In Count

VII, Plaintiffs allege that the OPM and Treasury DOGE Teams—"and to the extent the DOGE Teams are functionally controlled by Defendants USDS, USDSTO, OPM, GSA, Musk, and Davis, those Defendants as well"—engaged in ultra vires actions "[i]n directing and controlling the use and administration" of the BFS and EHRI systems without legal authority. *Id.* ¶¶ 160-65. And in Count VIII, Plaintiffs assert that the OPM and Treasury DOGE Teams—"and to the extent the DOGE Teams are functionally controlled by Defendants USDS, USDSTO, OPM, GSA, Musk, and Davis, those Defendants as well"—"are exercising powers imbued in OPM and Treasury by Congress" and thus violating the separation of powers. *Id.* ¶¶ 166-71.

### III. Procedural history

On February 12, Plaintiffs filed a motion for a temporary restraining order. *See* ECF No. 5. The motion was fully briefed, *see* ECF Nos. 7, 19, 20, and the Court held argument on February 21, *see* ECF No. 32. The Court converted the motion into one for a preliminary injunction and denied it the same day. *See* ECF No. 35. On May 6, Plaintiffs filed their Amended Complaint. *See* ECF No. 51. On Defendants' consent motion, *see* ECF No. 52, the Court ordered Defendants to respond to the Amended Complaint by June 3, 2025, *see* ECF No. 53.

### STANDARD OF REVIEW

**Rule 12(b)(1)**. Rule 12(b)(1) allows a party to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A challenge to subject matter jurisdiction under Rule 12(b)(1) may be facial or factual. A facial challenge contends that the complaint fails to allege facts upon which subject matter jurisdiction can be based. In reviewing a facial challenge, "all the facts alleged in the complaint are assumed to be true and the plaintiff . . . is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). In either a facial or factual challenge, "the plaintiff bears the burden of proving jurisdiction." *Bradford v. Mattis*, No. 3:18-CV-570-HEH, 2018 WL

6834360, at *2 (E.D. Va. Dec. 28, 2018) (citations omitted).

**Rule 12(b)(6)**. To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint's legal claims must be supported by factual allegations that "raise a right to relief above the speculative level." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The plausibility standard requires more than a showing of "a sheer possibility that a defendant has acted unlawfully." *Id*. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## ARGUMENT

Plaintiffs lack standing, and thus the Court lacks jurisdiction, because they do not allege a concrete injury in fact. Even if they had standing, Plaintiffs' claims each fail to state a claim because, as a matter of law, the agency-database access they allege does not violate the Privacy Act, the Internal Revenue Code, any Fifth Amendment privacy right, the APA or the separation of powers, and is not ultra vires agency action. Plaintiffs' Amended Complaint should be dismissed.

### I. Plaintiffs lack Article III standing because they have not alleged a cognizable injury in fact.

The Amended Complaint should be dismissed under Rule 12(b)(1) because both EPIC and Doe fail to carry their burden to plead standing. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed

by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). "Those specific standing requirements constitute an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* (internal quotation marks and citations omitted). "'When the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish.'" *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 489 (4th Cir. 2025) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009)). And "[t]he party seeking to establish standing carries the burden of demonstrating these elements." *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995).

EPIC, for its members,[1] and Doe have not demonstrated that they have suffered any injury in fact. To satisfy Article III standing, harm must be "actual or imminent, not speculative," meaning "the injury must have already occurred or be likely to occur soon." *Alliance for Hippocratic Med.*, 602 U.S. at 381. The harm must also be "concrete." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). To be concrete, an injury in fact must have a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417, 424 (quotation omitted). That inquiry asks whether "plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 424. Concrete intangible harms include injuries such as "reputational harms, disclosure of private information,

---

[1] As an organization, EPIC "can demonstrate Article III standing either in [its] own right or as a representative of [its] members." *Maryland Election Integrity, LLC v. Maryland State Bd. of Elections*, 127 F.4th 534, 538 (4th Cir. 2025) (internal quotation marks and citation omitted). EPIC does not rely on alleged injury to the organization itself but instead to the privacy interests of its members. *E.g.*, Am. Compl. ¶ 139. "To establish representational standing," EPIC "must demonstrate that" its "members would otherwise have standing to sue in their own right." *Maryland Election Integrity, LLC*, 127 F.4th at 538 (internal quotation marks and citation omitted). To do so, EPIC must establish injury in fact as to those members. *Id.*

and intrusion upon seclusion." *Id.* at 425. An alleged statutory violation alone does not meet that standard because "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. at 426 (internal quotation marks and citation omitted).

Those requirements are fatal to Plaintiffs. Plaintiffs assert a purely intangible form of injury—they allege that Treasury and OPM's granting access to USDS-affiliated personnel constitutes an invasion of privacy. *See, e.g.*, Am. Compl. ¶¶ 117, 125. That injury is not concrete. Plaintiffs do not contend their information has been shared with anyone outside the government. The USDS employees at the relevant agencies are bound by the same legal and ethical restrictions on the disclosure of Plaintiffs' information that bind all agency employees with access to that information. USDS EO § 4(b). As in *TransUnion*, 594 U.S. at 434, the mere fact that Treasury and OPM allegedly committed a statutory violation in allowing government employees to access government databases that store information does not alone demonstrate a concrete harm.

Nor have Plaintiffs "identified a close historical or common-law analogue for their asserted injury." *TransUnion*, 594 U.S. at 424. The Amended Complaint expressly identifies none. *See generally* Am. Compl. To the extent that Plaintiffs rely on the tort of intrusion upon seclusion, *see id.* ¶ 125, that does not suffice. As this Court recognized in denying Plaintiff's motion for a preliminary injunction, that tort "is the intentional intrusion, 'physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *Elec. Priv. Info. Ctr. v. U.S. Off. of Pers. Mgmt.*, 2025 WL 580596, at *5 (E.D. Va. Feb. 21, 2025) (quoting Restatement (Second) of Torts, § 652B (Am. L. Inst. 1977)). But Plaintiffs do not allege any "intentional intrusion" into Doe's or any EPIC member's private affairs—just abstract access to Treasury and OPM systems. Plaintiffs nowhere

allege that any government employee, "DOGE Affiliate[]" or otherwise, has accessed Doe's or any EPIC member's personal information stored in the BFS or EHRI systems.

And as a Fourth Circuit panel recently held in denying initial hearing en banc and staying, pending appeal, the district court's preliminary injunction in *American Federation of Teachers v. Bessent*—another challenge to USDS teams' access to Treasury and OPM record systems—the alleged "abstract access to personal information" does not establish a concrete injury analogous to the tort of intrusion upon seclusion. No. 25-1282, 2025 WL 1023638, at *2 (4th Cir. Apr. 7, 2025) (Agee, J., concurring); *see id.* at *4-5 (Richardson, J., concurring). Plaintiffs here, like appellees there, "fail to allege any interjection into the private sphere analogous to the unsolicited mailings in *Garey* [*v. James S. Farrin. P.C.*, 35 F.4th 917 (4th Cir. 2022)] or the unsolicited phone calls in *Krakauer* [*v. Dish Network*, 925 F.3d 643 (4th Cir. 2019)]." *Id.* at *2 (Agee, J., concurring). "At its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space." *Id.*; *see O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 246 (4th Cir. 2023) ("It's the unwanted intrusion into the home that marks intrusion upon seclusion, and [plaintiff] hasn't pleaded anything that closely relates to that."). Treasury and OPM granting federal employees access to Treasury and OPM databases that store individuals' personal information does not bear a "close relationship" to an intrusion into private space. As the Fourth Circuit panel concluded, "more than abstract access to personal information" is necessary "to establish a concrete injury." *Am. Fed'n of Teachers*, 2025 WL 1023638, at *2.

Nor are Doe's or EPIC members' alleged "unease and offense," Am. Compl. ¶ 125, the kind of harm necessary for an intrusion upon seclusion. Not just any "feeling of unease" will do; the tort instead applies to the sort of invasive disquiet "felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a neighbor's bedroom window for

weeks, and when a photographer snaps an opportunistic photo of a woman's underwear." *Am. Fed'n of Teachers*, 2025 WL 1023638, at *4 (Richardson, J., concurring); *see Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 25-1411, 2025 WL 1249608, at *7 (4th Cir. Apr. 30, 2025) (Richardson, J., dissenting) ("Intrusion upon seclusion does not guard against just any unease, no matter the cause. Rather, it guards against the unease of having one's 'private concerns' specifically targeted by another's 'investigation or examination.'" (quoting Restatement (Second) of Torts § 652B cmt. B)). And Plaintiffs' putative "significant fear" about alleged misuse or increased risk, Am. Compl. ¶ 126, cannot make up the difference because that injury is speculative. *Alliance for Hippocratic Med.*, 602 U.S. at 381.

Last, this case is like *American Federation of Teachers v. Bessent*—which specifically addressed alleged USDS access to Treasury and OPM systems—and lacks the distinctions that the Fourth Circuit relied on to grant initial hearing en banc and deny the government's motion to stay pending appeal in *American Federation of State, County & Municipal Employees, AFL-CIO v. Social Security Administration*.[2] The latter case "[w]as substantially stronger . . . than *Bessent*, with vastly greater stakes for many reasons." 2025 WL 1023638, at *4 (King, J., concurring). "Most especially" was that *AFL-CIO* concerns "the Social Security records of everyone, i.e., millions upon millions of American citizens and noncitizen taxpayers" and "include[d] family court and school records of children, medical and mental health treatment records, bank and credit card information, and tax and earnings information." *Id.*; *see also Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 2025 WL 1206246, at *3 (D. Md. Apr. 17, 2025)

---

[2] Following the Fourth Circuit's denial of this motion to stay, the federal government applied to the Supreme Court for a stay of the district court's preliminary injunction pending appeal. *See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty. & Mun. Emps.*, No. 24A1063 (U.S. May 2, 2025). That application is fully briefed and awaiting decision, which may issue at any time.

(reasoning that the "case differs markedly from [*American Federation of Teachers v.*] *Bessent*" because the "case involves access to personal information of children" and "involves SSA's access, inter alia, to extensive medical and mental health records of SSA beneficiaries"). Plaintiffs attempt to fit their claims into *AFL-CIO*'s analysis of Social Security Administration records by alleging that "[i]n addition to EHRI, OPM DOGE Team Members also have access to other OPM systems" including "HI, a system for managing employee health care that contains sensitive health information protected by the Health Insurance Portability and Accountability Act." Am. Compl. ¶ 113. That allegation, however, relies on a Bluesky social media post, *id.* ¶¶ 112 n.63, 113 n.65, that references only EHRI and not an "HI" system with healthcare records. And in any event, Plaintiffs make plain the basis for their claim: that "[b]y granting EHRI system access to DOGE Team Members, OPM disclosed vast stores of PII contained in those systems." Am. Compl. ¶ 116.

## II. Plaintiffs' claims each should be dismissed under Rule 12(b)(6) for failure to state a claim, even had they sufficiently pleaded standing.

### A. Plaintiffs have not alleged a violation of the Privacy Act (Count I).

#### 1) Plaintiffs do not allege "disclosure" of information about Doe or EPIC's members.

The Privacy Act limits the ability of an agency to "disclose" any "record" that is "contained in a system of records . . . to any person, or to another agency." 5 U.S.C. § 552a(b). The Privacy Act does not define "disclose." Its ordinary meaning is "[t]o make (something) known or public; to show (something) after a period of inaccessibility or of being unknown; to reveal." Black's Law Dictionary (12th ed. 2024). The Act defines a "record" as "any item, collection, or grouping of information *about an individual* that is maintained by an agency." 5 U.S.C. § 552a(a)(4) (emphasis added).

The Amended Complaint nowhere alleges that information *about Doe or EPIC's members* has been made known, shown, or revealed anywhere; Plaintiffs instead allege only that Treasury

and OPM have provided access to systems that *contain* Plaintiffs' records. Even construing "disclose" to mean the mere granting of access, *see Am. Fed'n of Teachers*, 2025 WL 895326, at *19; *Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 996542, at *12,[3] nowhere does the Amended Complaint allege that USDS employees were granted access to "information about [Doe or EPIC members]," 5 U.S.C. § 552a(a)(4)—at most, Plaintiffs allege that USDS employees have merely been granted access to large databases that contain such information somewhere.

### 2) Section 552a(b) permits intra-agency disclosure for official duties.

Even if the agency-database access were a Privacy Act disclosure, Plaintiffs' claim fails. The Privacy Act authorizes disclosure of such records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The access granted to USDS team members *within* the agencies falls comfortably within that.

As an initial matter, Plaintiffs' allegations that Treasury and OPM "disclos[ed] vast stores of PII to individuals unauthorized by law to access them, including . . . to USDS/DOGE personnel," Am. Compl. ¶ 64, ignores that the USDS EO requires agency heads to establish *in their agencies* a USDS team of at least four *employees*. USDS EO § 3(c). And those agency USDS team members have a "need" to access the records contained in the relevant systems in order to perform their official duties. 5 U.S.C. § 552a(b)(1). The USDS teams at Treasury and OPM exist under the USDS EO to modernize technology and to "[m]aximize [e]fficiency and [p]roductivity." USDS EO § 4. To that end, the USDS EO instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records,

---

[3] *But see, e.g.*, *Luster v. Vilsack*, 667 F.3d 1089, 1098 (10th Cir. 2011); *Walia v. Chertoff*, 2008 WL 5246014, at *11 (E.D.N.Y. Dec. 17, 2008); *Schmidt v. U.S. Dep't of Veterans Affairs*, 218 F.R.D. 619, 630 (E.D. Wis. 2003).

software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id*. § 4(b). Given the purpose of the USDS EO—to modernize technology—it necessarily follows that agency personnel seeking to improve agency data systems would need access to them to conduct that modernization. Put another way, it would be impossible for the USDS team members to perform the mandated task of modernizing these data systems without access to the systems themselves. Plaintiffs' insistence that the relevant Treasury and OPM employees nonetheless have "no need for the records" at issue, Am. Compl. ¶ 129, is entirely conclusory and thus insufficient to survive a motion to dismiss.

Plaintiffs' allegations confirm that the alleged disclosures are "intra-agency" and thus within "the need to know exception." *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 547 (3d Cir. 1989). Plaintiffs allege that "DOGE Team members formally assume titles as employees of or detailees to those agencies" and have "formal employment relationships . . . with their host agencies." Am. Compl. ¶¶ 58-59. As to BFS and EHRI database access, Plaintiffs allege that "Secretary Bessent granted to Treasury DOGE Team access to" BFS and that "DOGE Affiliates were appointed to OPM[4] and given . . . access to . . . the EHRI system." *Id*. ¶¶ 79, 106.

---

[4] The Court should not credit Plaintiffs' attempt to get around that allegation by asserting that "OPM grants DOGE personnel" and "DOGE affiliates" access to OPM systems and records—but not specifically EHRI—"without being appointed to OPM," citing the administrative record and plaintiff's brief in *American Federation of Government Employees v. U.S. OPM*, No. 1:25cv1237 (S.D.N.Y.) ("*AFGE v. OPM*"). Am. Compl. ¶¶ 107-109 nn.57-58. Specifically, Plaintiffs cite the *AFGE v. OPM* administrative record for the allegation that "[a]n additional ten DOGE affiliates were given access to OPM records without being appointed to OPM." Am. Compl. ¶ 109 n.57 (citing *AFGE v. OPM*, ECF No. 78 (OPM-000098-90, 098, 103)). That allegation is drawn from the *AFGE v. OPM* plaintiff's brief, which states that "[t]en other DOGE agents (OPM-9 through OPM-18) have access to OPM records, but the AR contains no evidence of their appointment to OPM. OPM-000089–90, OPM-000098, OPM-000103." *AFGE v. OPM*, ECF No. 84 at 4. The government's brief in *AFGE v. OPM*, however, states that "Defendants have not included onboarding, vetting, and credentialing documentation and information for OPM employees designated as OPM-9 through OPM-18 in the OPM administrative record, because as of March 6,

Even if not all disclosures to USDS personnel are considered intra-agency disclosures, Defendants' actions are permissible under the Privacy Act's exception for "routine use." *See* 5 U.S.C. § 552a(b)(3) (permitting disclosure absent consent for certain "Routine Uses" that are defined in a published Systems of Record Notice ("SORN")). Treasury's published Routine Use 17 permits disclosure to federal agency personnel "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." 85 Fed. Reg. 11,776, 11,780 (2020). Treasury's DOGE Team is tasked with doing just that. *See* USDS EO §§ 1, 4. And OPM's SORNs generally permit disclosures to personnel for work on a contract, service, grant, cooperative agreement or job for the federal government. 77 Fed. Reg. 73,694, 73,697 (Dec. 11, 2012).

### 3) The Amended Complaint alleges no cognizable Privacy Act relief.

Last, the Privacy Act cause of action exists for two categories of claims, neither of which Plaintiffs allege here. First, the Act creates a cause of action for actual money damages when an alleged disclosure has been "intentional or willful." 5 U.S.C. § 552a(g)(4). Because there has been no Privacy Act "disclosure" of Doe's or EPIC's members' records, as set forth above, Plaintiffs do not allege intent or willfulness, which requires "more than gross negligence." *Reinbold v. Evers*, 187 F.3d 348, 361 n.14 (4th Cir. 1999).

Second, the Privacy Act provides for injunctive relief in only two narrow circumstances: to order an agency to amend inaccurate, incomplete, irrelevant, or untimely records, 5 U.S.C. § 552a(g)(1)(A), (g)(2)(A); and to order an agency to allow an individual access to his records, *id.* § 552a(g)(1)(B), (g)(3)(A). When, as here, "[a] 'statute provides certain types of equitable relief

---

2025, none of these individuals had logged into, and thereby accessed, an OPM data system that would be subject to the Privacy Act." *AFGE v. OPM*, ECF No. 84 at 5 n.5.

but not others, it is not proper to imply a broad right to injunctive relief.'" *Parks v. IRS*, 618 F.2d 677, 84 (10th Cir. 1980) (citation omitted). Injunctive relief is thus not available for any other type of Privacy Act claim. *See Sussman v. U.S. Marshal Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007) ("We have held that only monetary damages, not declaratory or injunctive relief, are available to § 552a(g)(1)(D) plaintiffs." (citing *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988))).

> ### B. Plaintiffs have not alleged a violation of Internal Revenue Code § 6103 (Count II).

Plaintiffs do not state a claim under § 6103 of the Internal Revenue Code ("IRC"). Only Doe asserts this claim and only with respect to Treasury; Doe does not assert that OPM's data was improperly accessed or disclosed in violation of § 6103. *See* Am. Compl. ¶¶ 132-33. Doe's § 6103 claim fails for the same reason that her Privacy Act claim does. Section 6103 states that no federal employee "shall disclose" tax return information unless otherwise permitted. 26 U.S.C. § 6103(a). As set forth above, Doe does not allege that Treasury has wrongfully inspected or disclosed *her* tax return or return information—just that Treasury has granted access to agency databases that contain tax return information somewhere.

Doe also fails to allege other elements of her claim. "Section 7431 provides a civil cause of action for violations of § 6103." *McKenzie-El v. IRS*, 2020 WL 902546, at *12 (D. Md. Feb. 24, 2020). So to plead her cause of action, Doe must allege that the United States violated § 6103. *See* 26 U.S.C. § 7431(a)(1) ("If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages."). And to do that, she "must specifically allege who made the alleged disclosures, to whom they were made, the nature of the disclosures, the circumstances surrounding them, and the dates on which they were made." *Bancroft Global Dev. v. United States*, 330 F. Supp. 3d 82, 101 (D.D.C. 2018)

(internal quotation marks omitted); *McKenzie-El*, 2020 WL 902546, at *13 ("To state a claim under § 7431(a), a plaintiff must adequately plead (1) that the disclosure was unauthorized, (2) that the disclosure was made knowingly or by reason of negligence and (3) that the disclosure was in violation of Section 6103. This standard requires that a plaintiff 'specifically allege who made the alleged disclosures, to whom they were made, the nature of the disclosures, the circumstances surrounding them, and the dates on which they were made.'" (first internal quotation marks and citation omitted) (quoting *Bancroft Global Dev.*, 330 F. Supp. 3d at 101)). The purpose of this requirement is "to put the Government on notice of which exact actions a plaintiff challenges" so that the defendant "is able to identify which exception, if any, the disclosure will fall into under § 6103" because "[a]bsent a proper identification of the alleged illegally disclosed information, there would be a constant guessing game as to the disclosures and exceptions." *Bancroft Global Dev.*, 330 F. Supp. 3d at 101 (quotation marks and citation omitted). This standard also prevents a plaintiff from proceeding based on the mere speculation that her personal information might have been disclosed or inspected. *McKenzie-El*, 2020 WL 902546, at *13 ("[A] 'plaintiff must also plead what specific return or return information an employee of the United States disclosed that violated § 6103.'" (quoting *Bancroft Global Dev.*, 330 F. Supp. 3d at 101)); *see also, e.g.*, *Fostvedt v. IRS*, 824 F. Supp. 978, 985-86 (D. Colo 1993), *aff'd sub nom. Fostvedt v. United States*, 16 F.3d 416 (10th Cir. 1994) (dismissing complaint where plaintiff alleged that IRS special agent made various disclosures unknown to plaintiff).

Doe has not sufficiently alleged a § 6103 violation. The alleged § 6103 violation is that Treasury has "disclos[ed] and inspect[ed] confidential return information contained in the BFS system." Am. Compl. ¶ 135. But even assuming that Treasury granting access to agency databases that contain tax return information somewhere qualifies as a § 6103 disclosure (it does not), Doe

does not allege that Treasury has wrongfully inspected or disclosed *her* tax return or return information and thus cannot plead a claim. 26 U.S.C. § 7431(a)(1) ("return or return information *with respect to a taxpayer . . . such taxpayer* may bring a civil action"). And in any event, the Amended Complaint does not "specifically allege who made the alleged disclosures, to whom they were made, the nature of the disclosures, the circumstances surrounding them, and the dates on which they were made." *McKenzie-El*, 2020 WL 902546, at *13.

Even if she had alleged a specific unlawful disclosure, Doe's claim would still fail because an exception to the general rule of § 6103(a) applies. "[O]fficers and employees of the Department of the Treasury" may obtain returns and return information if their "official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1). "Tax administration," in turn, is broadly defined to include "the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws." *Id.* § 6103(b)(4)(A)(i). The payment systems at issue in this case disburse the vast majority of government payments, including tax refunds. *See* Fiscal Service Overview, *available at* https://www.fiscal.treasury.gov/about.html (last visited May 28, 2025). Professionals who maintain and improve the payment systems need access to the data in those systems in order to administer the tax laws. The USDS team at Treasury satisfied these statutory conditions for access to returns and return information pursuant to the USDS EO.[5]

---

[5] Although Plaintiffs assert that access to Treasury's data systems has been provided to non-Treasury employees, *see e.g.*, Am. Compl. ¶ 94, all such allegations are entirely conclusory and thus should not be credited on a motion to dismiss. The only well-pleaded allegations concerning access to Treasury's systems, even accounting for the news articles the Amended Complaint appears to incorporate by reference, are that access has been provided to *Treasury employees*. *See, e.g.*, Am. Compl. ¶¶ 62 n.11, 66 n.14, 79 n.39. That would be consistent with the USDS EO, which instructs agencies to create USDS teams comprised of agency "employees." USDS EO § 3(c).

**C.      Plaintiffs have not alleged a Fifth Amendment violation (Count III).**

For at least three independent reasons, the Court should dismiss Plaintiffs' claim that Defendants' challenged actions infringe on their claimed due process right to "informational privacy" under the Fifth Amendment.

**1**. As a threshold matter, the Supreme Court has never held that a constitutional right to informational privacy exists. In the few decisions considering such claims, the Court has merely assumed, without holding, that there is such a right in the course of concluding that the challenged government action did not violate it. *See, e.g.*, *NASA v. Nelson*, 562 U.S. 134, 144-48 (2011). Despite this nonchalance, the Fourth Circuit has recognized an "individual interest in avoiding disclosure of personal matters," albeit one limited to "information with respect to which the individual has a reasonable expectation of privacy." *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021) (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 192-93 (4th Cir. 1990), *abrogated in other part by Lawrence v. Texas*, 539 U.S. 558 (2003)).[6]

Leaving to one side the questionable provenance of the right Plaintiffs claim, to the extent that it exists, it is quite narrow. The Supreme Court and the Fourth Circuit have considered informational privacy only in the context of (1) the government's *collection* of information (*i.e.*, whether the government may compel individuals to disclose information in the first instance), and (2) the government's *public* disclosure of information within its control (*i.e.*, whether the government may disseminate information it has obtained to third parties). *E.g.*, *Nelson*, 562 U.S. at 138 (employment background investigation); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 429 (1977) (compelled production of former President's papers and tape recordings); *Whalen v. Roe*,

---

[6] Although *Payne* was constrained to follow *Walls*, the Fourth Circuit made a point of noting the unstable foundation of the claimed right to informational privacy. *See* 998 F.3d at 653-57; *see also Am. Fed'n of Gov't Emps. v. HUD*, 118 F.3d 786, 788 (D.C. Cir. 1997) (expressing "grave doubts" that a right to informational privacy exists).

429 U.S. 589, 591 (1977) (compilation of prescriptions for certain drugs); *Payne*, 998 F.3d at 652-53 (doctor's disclosure of prisoner's HIV-positive status); *Walls*, 895 F.2d at 189 (employment questionnaire). And even in those cases, both courts have concluded that the government action either did not implicate or did not violate whatever right to informational privacy there might be.

None of these cases involved the distinct question, posed by this case, of whether a government's *internal* granting of access to information it already possesses implicates a constitutional informational-privacy right. To the extent that there is any authority on this question, it seems to cut the other way. *See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 74 (D.C. Cir. 2019) ("[A]ssuming (without deciding) the existence of a constitutional right to informational privacy, it affords relief only for intentional disclosures or their functional equivalent." (internal citations omitted)). In such an "uncharted area" as this, where "guideposts for responsible decision-making . . . are scarce and open-ended," the Court "must be 'reluctant to expand the concept of substantive due process.'" *Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)).

**2**. Even if Plaintiffs could demonstrate that a right to informational privacy exists *and* that intra-governmental sharing of information implicates the right, Plaintiffs' claim would still fail because the Supreme Court has made clear that "a 'statutory or regulatory duty to avoid unwarranted disclosures' generally allays . . . privacy concerns." *Nelson*, 562 U.S. at 155 (quoting *Whalen*, 429 U.S. at 605). As relevant here, the requirements of the Privacy Act and the IRC "give 'forceful recognition' to a Government employee's interest in maintaining the 'confidentiality of sensitive information . . . in his personnel files." *Id.* at 156 (quoting *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 318 n.16 (1979)). The Privacy Act and the IRC therefore "'evidence a proper

concern' for individual privacy" and obviate any constitutional question regarding individuals' informational privacy. *Id.* (quoting *Whalen*, 429 U.S. at 605).

**3.** Finally, on top of the fatal defects above, Plaintiffs cannot show that the challenged Executive actions rise to the egregious level required to make out a due process claim. "An executive act can violate substantive due process only when the act shocks the conscience." *United States v. Al-Hamdi*, 356 F.3d 564, 574 (4th Cir. 2004). And "[u]sually," intent to harm is "necessary to satisfy the shocks-the-conscience test for a substantive due process violation." *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 320 (4th Cir. 2012) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

Nothing of the sort occurred here. Plaintiffs complain merely that Treasury and OPM have provided federal employees access to digital systems that contain Plaintiffs' personal information. Notwithstanding Plaintiffs' protestations that *these particular* federal employees should not be able to access Plaintiffs' information, and their speculation that such access may make that information more vulnerable to a hypothetical future breach, something so quotidian as intra-governmental information-sharing cannot colorably be classed among "the most egregious official conduct." *Id.* at 321 (quoting *Lewis*, 523 U.S. at 846). Because Plaintiffs cannot show that Defendants "*intended to harm*" them, they cannot establish "conscience-shocking conduct . . . as would be necessary to establish a substantive due process violation." *Id.* at 322.

**D.    Plaintiffs have not pleaded a cognizable APA claim (Counts IV-VI).**

**1)    The agency database access alleged here is not agency action that is subject to APA review.**

Plaintiffs' contrary-to-law and arbitrary-and-capricious APA claims (Counts IV-V) fail because they do not challenge discrete Treasury or OPM action but instead attack the agencies' programmatic activities that are not agency action subject to APA review. "When challenging

agency action . . . the plaintiff must . . . identify specific and discrete governmental conduct, rather than launch a broad programmatic attack on the government's operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (internal quotation marks and citation omitted). And "[r]eview is available only when acts are discrete in character, required by law, and bear on a party's rights and obligations." *Id.* at 432.

Plaintiffs challenge Treasury and OPM's database-access practices in general in effectuating the USDS EO; they do not identify, for instance, a specific unauthorized disclosure. *See generally* Am. Compl. Plaintiffs thus "ask that [the Court] supervise an agency's compliance with . . . broad statutory mandate[s]." *City of New York*, 913 F.3d at 433 (internal quotation marks and citation omitted). That compliance "is the sort of public policy problem that often requires reallocating resources, developing new administrative systems, . . . working closely with partners across government[, and] will likely require expertise in information technology and deep knowledge of how [Treasury and OPM] needs intersect with data collection." *Id.* It is "exactly the sort of 'broad programmatic' undertaking for which the APA has foreclosed judicial review." *Id.* (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("*SUWA*")).

### 2) Even if Plaintiffs had identified judicially reviewable agency action, they have not identified a final agency action.

Even if Plaintiffs had identified judicially reviewable agency action, their contrary-to-law and arbitrary-and-capricious APA claims fail because they have not identified a *final* agency action. APA review is limited to "final agency action." *SUWA*, 542 U.S. at 61-62 (quoting 5 U.S.C. § 704). Agency action is final only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). The APA does not

permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Nor does the APA authorize courts to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bur. of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

Plaintiffs' Amended Complaint fails to show how providing federal employees with system access necessary to carry out a lawfully issued Executive Order creates any rights, obligations, or legal consequences for Plaintiffs. *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (no agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "d[id] not subject them to new penalties or enforcement risks"). Instead, Plaintiffs' Amended Complaint seeks review of day-to-day management of agency operations. Indeed, the alleged "agency action" Plaintiffs identify is a series of personnel decisions related to granting government employees access to agency data systems. These are precisely the type of day-to-day operational decisions that the Supreme Court in *Lujan* advised do not fall within the APA's ambit. *See Lujan*, 497 U.S. at 899. And it is the kind of APA challenge where "courts would be forced either to enter a disfavored 'obey the law' injunction or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *City of New York*, 913 F.3d at (citations omitted); *Am. Fed'n of Teachers*, 2025 WL 1023638, at *5 (Richardson, J., concurring) ("The agency action here—granting IT access to certain employees—does not fit comfortably into either bucket [of the two-pronged final-agency-action test].").

### 3) The agency database access alleged here is not contrary to law.

Even if reviewable and final, Plaintiffs' contrary-to-law APA claim fails because Treasury and OPM's database access decisions do not violate the Privacy Act, the Federal Information Systems Modernization Act" ("FISMA"), 26 U.S.C. § 6103, or the Fifth Amendment. *See* Am.

Compl. ¶ 146; *id*. ¶¶ 142-47. Treasury and OPM's database access decisions are not contrary to the Privacy Act, 26 U.S.C. § 6103, or the Fifth Amendment for all of the reasons set forth above.

As to FISMA, the APA explicitly excludes from judicial review those agency actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). To determine whether a matter has been committed to agency discretion, the Fourth Circuit applies a two-part inquiry. *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 290 (4th Cir. 2022). First, the Court asks whether the agency action "is the kind of agency action that has traditionally been committed to agency discretion." *Id*. (internal quotation marks and citations omitted). If so, the Court must then determine whether the relevant statute "intentionally limits agency discretion by setting guidelines or otherwise providing a limit" for agency discretion. *Id*.

Here, as to the first part, Congress passed FISMA to "provide a comprehensive framework for ensuring the effectiveness of information security controls over information resources that support Federal operations and assets." 44 U.S.C. § 3551(1). Congress, however, specifically "recognize[d] that the selection of specific technical hardware and software information security solutions should be left to individual agencies from among commercially developed products." 44 U.S.C. § 3551(6). In the FISMA context, then, agency action is expressly "the kind of agency action . . . committed to agency discretion." *Holbrook*, 48 F.4th at 290.

As to the second part—any limit to that discretion—FISMA offers no specific prescriptions for the tools or methods required, which is unsurprising considering the rapidly evolving nature of both technology and cyber threats. Instead, Congress vested agencies with broad discretion to adopt "security protections commensurate with the risk and magnitude of the harm" resulting from cyber threats. 44 U.S.C. § 3554(a)(1)(A). FISMA gives agencies latitude to develop security policies and procedures that are "appropriate" and "cost-effectively reduce information security

risks to an acceptable level." *Id*. at § 3554(b)(2)(B). To achieve its goals, FISMA assigns *exclusive* responsibility for overseeing the management and security of information systems of civilian agencies to the Director of the Office of Management and Budget ("OMB"). FISMA mandates that the OMB Director "shall oversee agency information security policies and practices, including . . . overseeing agency compliance with the requirements of this subchapter [of FISMA.]" *Id*. § 3553(a)(5). FISMA specifically authorizes the OMB Director "to enforce accountability for compliance," *id.*, through various mechanisms, including by "tak[ing] any action that the Director considers appropriate, including an action involving the budgetary process or appropriations management process," 40 U.S.C. § 11303(b)(5)(A). The Director also must review each agency's security programs at least annually and approve or disapprove them. 44 U.S.C. § 3553(a)(5). Finally, he must report to Congress annually on the "effectiveness of information security policies and practices during the preceding year." *Id.* § 3553(c). Accordingly, a federal agency's compliance with FISMA is committed to agency discretion by law, and FISMA cannot be the basis of Plaintiffs' APA claim. *See Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006) ("Notably absent from FISMA is a role for the judicial branch. We are far from certain that courts would ever be able to review the choices an agency makes in carrying out its FISMA obligations."); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab.*, 2025 WL 542825, at *4 (D.D.C. Feb. 14, 2025) ("Plaintiffs' arguments that defendants are violating . . . FISMA . . . are not likely to succeed because FISMA may not be subject to review under the APA." (citing *Cobell*, 455 F.3d at 314)); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 266 F. Supp. 3d 1, 44 (D.D.C. 2017), *aff'd in part, rev'd in part in other grounds and remanded*, 928 F.3d 42 (D.C. Cir. 2019) ("The Court holds that OPM's actions in carrying out [FISMA's] requirements is committed to the agency's discretion, and not subject to judicial review under the APA.").

4) **The agencies' decision to grant database access was not arbitrary or capricious.**

Plaintiffs' Count V asserts that Treasury and OPM's database-access practices in effectuating the USDS EO were arbitrary and capricious in violation of 5 U.S.C. § 706(2). Am. Compl. ¶¶ 148-153. Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But for all of the reasons set forth above, Treasury and OPM are lawfully implementing the USDS EO, which requires agency heads to establish in their respective agencies a USDS team of at least four employees, USDS EO § 3(c), and instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," *id.* § 4(b). Though labelled an arbitrary-and-capricious APA claim, Plaintiffs' challenge is to *the USDS EO itself*, and their attempt to dress it as an APA claim should be dismissed. *But see Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 1206246, at *67-68 (D. Md. Apr. 17, 2025)

5) **Plaintiffs' contrary-to-law and arbitrary-and-capricious APA claims are barred because they have an adequate, alternative remedy.**

Plaintiffs' contrary-to-law and arbitrary-and-capricious APA claims fail for the additional, independent reason that the APA cause of action exists only when "there is no other adequate remedy in a court." 5 U.S.C. § 704; *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). That is not the case here. The Privacy Act

provides a "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information about individuals. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)). And the other-adequate-remedy bar applies even where the plaintiff may not succeed on the merits of her claim under the alternative statutory review procedure; the existence of that procedure alone suffices. *See Rimmer v. Holder*, 700 F.3d 246, 261-62 (6th Cir. 2012); *Jones v. U.S. Dep't of Hous. & Urban Dev.*, No. 11 CIV. 0846 (RJD) (JMA), 2012 WL 1940845, at *6 (E.D.N.Y. May 29, 2012) (reasoning that an alternative was adequate "whether or not relief is ultimately granted"). Plaintiffs' APA claim should be dismissed. *But see Am. Fed'n of Teachers v. Bessent*, 2025 WL 895326, at *19 n.17 (D. Md. Mar. 24, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 2025 WL 996542, at *18 (S.D.N.Y. Apr. 3, 2025).

### 6) Treasury and OPM were not required to engage in notice-and-comment rulemaking under 5 U.S.C. § 553.

Plaintiffs notice-and-comment APA claim under 5 U.S.C. § 553 (Count VI) should be dismissed. Am. Compl. ¶¶ 154-59. "Under the APA, 'rules' which have the 'force and effect of law' are required to be 'issued through a statutorily prescribed notice-and-comment process.'" *Cmty. Assocs. Inst. v. Yellen*, 2024 WL 4571412, at *5 (E.D. Va. Oct. 24, 2024) (quoting *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620-621 (4th Cir. 2018) (citing 5 U.S.C. § 553(a)-(c)). "But the APA excludes from this requirement 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Id.* (quoting 5 U.S.C. § 553(b)(A)).

Plaintiffs assert that Treasury and OPM's "decisions to adopt new system access policies that effectively revoke pre-existing system policies constitute the promulgation of a new substantive rule." Am. Compl. ¶ 156. But nowhere do Plaintiffs allege that Treasury and OPM

*have* revoked or promulgated any new rules, let alone any with the force and effect of law. The Amended Complaint instead alleges exactly the type of rules of agency organization, procedure, or practice that are excluded from notice-and-comment rulemaking. *See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, No. CV 25-339 (JDB), 2025 WL 1129227, at *21 (D.D.C. Apr. 16, 2025) ("No allegation states or reasonably implies that the pre-existing system-access regulations do not continue to apply in full force in all situations in which the disclosure would be to someone or to some agency other than USDS and its personnel.").

### E. Plaintiffs' ultra vires claim should be dismissed (Count VII).

Plaintiffs' ultra vires claim fails. "[C]ourts have recognized that an implicit and narrow exception to the bar on judicial review exists for claims that the agency exceeded the scope of its delegated authority or violated a clear statutory mandate. This exception was first recognized in *Leedom v. Kyne*, 358 U.S. 184 (1958)." *Hanauer v. Reich*, 82 F.3d 1304, 1307 (4th Cir. 1996) (citation omitted). To invoke the *Leedom* exception, a plaintiff "must make (1) a strong and clear demonstration that a clear, specific and mandatory statutory provision has been violated, and (2) the absence of federal court jurisdiction over an agency action would wholly deprive the aggrieved party of a meaningful and adequate means of vindicating its statutory rights." *Scottsdale Cap. Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, 844 F.3d 414, 421 (4th Cir. 2016) (cleaned up). A court's "review under the ultra vires standard is necessarily narrow." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 698 F.3d 171, 179 (4th Cir. 2012). "Government action is ultra vires if the agency or other government entity is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden." *Id*. (quotation marks and citation omitted). And in applying the *Leedom* exception, courts "may not dictate how government goes about its business but only whether a public entity has acted within the bounds of its authority or overstepped them." *Id*. (quotation marks and citation omitted).

Plaintiffs' ultra vires claim is duplicative of their Privacy Act, IRC, Fifth Amendment, and APA claims. *See* Am. Compl. ¶¶ 161, 164. For all of the reasons that those claims fail, Plaintiffs have likewise failed to allege ultra vires action. *But see Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 996542, at *19-20; *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab.*, 2025 WL 1129227, at *22 (D.D.C. Apr. 16, 2025).

### F. Plaintiffs' separation of powers claim fails (Count VIII).

Plaintiffs' final claim is that the Treasury and OPM DOGE Teams (and any "functional[]" overseers) are violating the separation of powers by exercising "powers imbued in OPM and Treasury by Congress." Am. Compl. ¶¶ 166-71. This claim fundamentally misunderstands the interplay between the Legislative and Executive Branches.

Notwithstanding Plaintiffs' occasional gestures at other, similarly policy-oriented grievances,[7] this case is about certain federal employees' access to data systems at OPM and Treasury. *See* Am. Compl. ¶¶ 1-7. Such access in no way falls within Congress's purview. The Constitution assigns to Congress enumerated "legislative [p]owers," U.S. CONST. art. I § 1, which encompass those "actions taken" that "contain matter which is properly to be regarded as legislative in its character and effect," *INS v. Chadha*, 462 U.S. 919, 952 (1983) (citation omitted). True enough, Congress may have "exercised its Article I authority to create both Treasury and OPM." Am. Compl. ¶ 168. But once they are created, agencies then operate as an exercise of the *Executive* power. *See City of Arlington, Tex. v. FCC*, 569 U.S. 290, 304 n.4 (2013) (explaining that while agency "activities take 'legislative' and 'judicial' forms, . . . they are exercises of—

---

[7] *E.g.*, Am. Compl. ¶ 54 (criticizing, *inter alia*, "unlawful agency closures or partial closures, and unlawful grant and contract terminations"); *see id.* ¶¶ 74, 78, 96 (contending that the Treasury DOGE Team may interfere with the agency's payments to "federal contractors, charities that provide social services, and other federal departments"). To the extent that Plaintiffs mean to assert claims premised on such "generally available grievance[s] about government," they have no standing to do so. *Lujan*, 504 U.S. at 573.

indeed, under our constitutional structure they *must be* exercises of—the 'executive Power'" (quoting U.S. CONST. art. II § 1, cl. 1)); *Chadha*, 462 U.S. at 951 ("When the Executive acts, it presumptively acts in an executive or administrative capacity as defined in Art. II."). Correspondingly, those agencies are answerable to the President and such "lesser executive officers" as he may choose—officers who "must remain accountable to the President, whose authority they wield." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020). Indeed, the "entire 'executive Power' belongs to the President alone." *Id*; *see id.* at 224 ("Article II 'makes a single President responsible for the actions of the Executive Branch.'" (citation omitted)). In short, an agency's creation is a Legislative function, but its operation—including the sort of personnel decisions Plaintiffs challenge here—is an Executive one. *See id.* at 213 ("[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." (citation omitted)).

Plaintiffs do not seriously claim otherwise. They do not allege, for instance, that only *Congress* has the power to determine which Treasury and OPM employees may access the agencies' respective data systems. Rather, Plaintiffs seem to allege only that there is no explicit statutory authorization for the agencies' DOGE Teams to access agency data systems. *See, e.g.*, Am. Compl. ¶¶ 167, 171. But this argument proves too much, since no statute specifically authorized access by the Treasury and OPM "career civil servants" whom Plaintiffs cite as having "historically—and successfully—[] operated" the data systems at issue. *Id.* ¶ 68. Nor can Congress be expected to micromanage such administrative minutiae legislatively. *Cf. Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act."). Workaday decisions as to which agency employees may access which agency data

systems are instead, as explained above, quintessentially an Executive function.[8] Thus, although Plaintiffs may—and do—test the DOGE Teams' data access for "adherence to statutory standards," *Chadha*, 462 U.S. at 953 n.16, their claim that such access impinges on the separation of powers is without merit since granting such access is not a "constitutional function[] assigned to" Congress, *Morrison v. Olson*, 487 U.S. 654, 676 (1988).

### G. Plaintiffs do not allege any personal involvement of GSA Defendants.

Finally, although Plaintiffs have added GSA and its Acting Administrator ("GSA Defendants") as defendants in this action, the Amended Complaint contains no well-pleaded factual allegations of any wrongdoing or injury caused by those defendants. Plaintiffs merely allege that GSA is a "'home base[]' for DOGE" and further speculate that GSA, among other named defendants, may—or may not—"functionally control[]" the agency DOGE teams at issue. Am. Compl. ¶¶ 46, 52-54, 161, 165, 170. Because Plaintiffs do not plausibly allege either that the GSA Defendants "were personally involved" in the claimed violations of Plaintiffs' rights, *Sheppard v. Claiborne*, 2021 WL 4975070, at *3 (E.D. Va. Oct. 26, 2021), or that Plaintiffs suffered "injury resulting from [*those*] *defendant*[*s'*] conduct," *Abu Irshaid v. Garland*, 2025 WL 756544, at *16 (E.D. Va. Mar. 10, 2025) (emphasis added), Plaintiffs fail to state a claim against the GSA Defendants.

### CONCLUSION

The Court should dismiss Plaintiffs' Amended Complaint.

---

[8] Even if such decisions could conceivably fall within the Legislative power—they cannot—it is worth noting the stark contrast between the rigid understanding of Executive power, "all of" which is and must be vested in the President, *Seila Law*, 591 U.S. at 203, and the Legislative power, which, although not subject to outright delegation, is understood with "flexibility and practicality," such that Congress "may confer substantial discretion on executive agencies to implement and enforce the laws," *Gundy v. United States*, 588 U.S. 128, 135 (2019) (citation omitted). Decisions as to who may access agency data systems would certainly seem to fall within such discretion, particularly where Plaintiffs can point to no statute purporting to directly regulate those decisions.

Dated: June 3, 2025

ERIK S. SIEBERT
UNITED STATES ATTORNEY

By: /s/ Jonathan T. Lucier
JONATHAN T. LUCIER, VSB No. 81303
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Tel.: (804) 819-5400
Fax: (804) 771-2316
Email: jonathan.lucier@usdoj.gov

PETER B. BAUMHART
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel.: (703) 299-3738
Fax: (703) 299-3983
Email: Peter.Baumhart@usdoj.gov

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

JOSEPH E. BORSON, VSB No. 85519
Assistant Director
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.: (202) 305-0747
Email: Joseph.Borson@usdoj.gov

*Attorneys for Defendants*